# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**N.T.** *et al.*,

    **Plaintiffs**

v.            **CIVIL NO. JKB-11-356**

**BALT. CITY BD. OF SCH. COMM'RS** *et al.*,

    **Defendants**

## MEMORANDUM

This lawsuit was initiated by a Baltimore City public school student and his mother against the school board and various school officials to seek redress of grievances that primarily center upon the allegation of denial of free appropriate public education ("FAPE"). Relying upon Federal Rule of Civil Procedure 12(b)(6), Defendants have moved to dismiss certain counts of the complaint. The Court has considered the motions (ECF Nos. 25 & 28),[1] Plaintiffs' opposition (ECF No. 30), and Defendants' reply (ECF No. 31). The motions will be granted in part and denied in part.

In turning to the merits of Defendants' motion, the Court preliminarily notes it contains some confusing statements. Although Defendants specifically indicate their motion is addressed to Count III and Count VI, they proceed to argue the inadequacy of Count I before concluding

---

[1] Two sets of defendants filed identical motions and are represented by the same attorney. In its discussion, the Court will refer to the motions in the singular.

with a request that all three of these counts be dismissed. (Defs.' Mot. Dismiss Supp. Mem. 6-11, ECF No. 25.) The Court will address all three counts in this opinion.[2]

## I. Count I – disability discrimination, denial of FAPE, failure to comply with applicable procedures

### A. Exhaustion

Defendants first argue Plaintiffs have failed to exhaust their administrative remedies before filing suit. Plaintiffs assert they are not required to do so. The truth in this case lies somewhere in between.

A lawsuit claiming a violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, is conducted according to "[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation)." 29 U.S.C. § 794a(a)(2). The procedures in those other statutes, adopted by reference, do not mandate exhaustion of administrative remedies. *See Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) ("Title VI litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court").

However, even though those applicable statutes do not require exhaustion of administrative remedies for claims made under section 504 (29 U.S.C. § 794), another statute does require exhaustion. The Individuals with Disabilities Education Act ("IDEA"), codified in 20 U.S.C. § 1400 *et seq.*, sets forth a detailed set of procedures for children with disabilities and parents of children with disabilities to follow in obtaining free appropriate public education ("FAPE"). It also establishes procedural safeguards and mechanisms to be followed by the

---

[2] As Defendants point out, the complaint has only five counts. What should be the fifth count, however, is denominated Count VI. This opinion maintains the numbering system employed in the complaint.

public entities subject to it. In 20 U.S.C. § 1415, IDEA grants a right to bring a civil action in state courts and federal district courts to "[a]ny party aggrieved by the findings and decision made" by the agency, but limits the time in which a suit may be brought to 120 days from the date of the hearing officer's decision. 20 U.S.C. § 1415(i)(2)(B) (federal statutory limitation period of 90 days ineffective when the applicable state prescribes a different period; incorporating applicable Maryland limitation period established in Md. Code Ann., Educ. § 8-413(j) (LexisNexis 2008)). Of particular importance is subsection *l* of 20 U.S.C. § 1415, which provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 et seq.], ***title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 et seq.]***, or other Federal laws protecting the rights of children with disabilities, ***except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.***

(Emphasis added.)

In the instant case, Plaintiffs complain that "a Baltimore City Public School officials [sic]" refused to accommodate N.T.'s disability in the classroom, intentionally discriminated against N.T. and punished him for behaviors associated with his disability, violated his due process rights relating to procedures for suspension and expulsion, failed to provide N.T. with a FAPE, and failed to implement and follow section 504 procedural safeguards. (Compl. 2.) Additionally, Plaintiffs allege that the Baltimore City Board of School Commissioners failed to implement and enforce laws protecting handicapped students. (*Id.*) Most of these allegations are within the scope of 20 U.S.C. § 1415 and, therefore, are subject to IDEA's exhaustion requirement.

Consequently, it must be determined whether Plaintiffs have exhausted their complaint using the procedures set forth in IDEA. The complaint describes a number of contacts N.T.'s mother has had with the Baltimore City school system over the years since 2003 and her repeated efforts to advocate for fair treatment of her son. This section of the Court's opinion only includes contacts beginning with February 2010 because of their relation to the question of exhaustion.

N.T. was suspended from school at the beginning of February 2010 allegedly for fighting. (Compl. ¶¶ 47-49.) His mother indicates the school held a "manifestation meeting" on February 4, 2010, but she was not notified such a meeting would occur, and N.T. was not given a chance to say anything; the school determined the incident was not a manifestation of his disability and he was recommended for extended suspension.[3] (*Id.* ¶ 50.) Plaintiffs allege "N.T. was not given notice of his due process right to be represented by counsel, to present testimony of witnesses and cross examine opposing witnesses, or present written evidence and legal argument and to sequester witnesses" for this proceeding. (*Id.* ¶ 51.) N.T.'s mother attended a meeting on February 22, 2010, in which the school recommended N.T. for expulsion and advised her of her right to appeal the decision within ten days. (*Id.* ¶ 52.) On March 1, 2010, she received a second notice of expulsion and notice of N.T.'s due process rights and right to appeal the decision. (*Id.* ¶ 53.) She filed an appeal of the school system's decision to expel N.T. on March 2, 2010, but she alleges the system would not accept her appeal until her counsel supplied her retainer agreement to it. (*Id.* ¶ 54.) The same day, she requested a complete copy of N.T.'s student records. (*Id.*) She was told the records would not be released without a subpoena. (*Id.*)

---

[3] "Manifestation determination" is a term used in IDEA, 20 U.S.C. § 1415(k)(1)(E), which prescribes a procedure to be used by the school for determining whether a child's conduct is a manifestation of the child's disability.

On March 10, 2010, N.T.'s mother received a notice regarding a conference at the Office of Suspension Services to be held on April 3, 2010. (*Id.* ¶ 55.) She filed a due process complaint with the Department of Student Support Services Office of Intervention on March 13, 2010. (*Id.* ¶ 56.) On March 23, 2010, Defendant Jonathan Brice, executive director of Student Support and Safety, offered N.T.'s mother "a mediation session regarding [N.T.]'s 'academic success,' so long as the meeting did not include [her] attorney." (*Id.* ¶ 57.) On March 26, 2010, she met with Brice and, in writing, withdrew her appeal in exchange for her son's reinstatement to school on April 6, 2010. (*Id.* ¶ 58.) On the latter date, she requested updated assessments and an "SST meeting"[4] with the school to discuss N.T.'s current academic performance, how he was going to be able to finish out the school year, and what section 504 services would be provided to him. (*Id.* ¶ 59.) She alleges that on April 26, 2010, she received N.T.'s educational records after making multiple attempts in writing and by telephone, but further states the records are incomplete because of their omission of multiple suspension records and behavioral referrals. (*Id.* ¶ 60.)

N.T.'s mother alleges she met with Mattie Burton at Dunbar High School on May 14, 2010, to discuss how her son could finish out the school year and what services would be provided to him. (*Id.* ¶ 61.) At this meeting, she made a number of requests on N.T.'s behalf, including restoration of counseling services,[5] updated educational and psychological assessments, tutoring support, weekly progress reports to her, and summer school to make up course work from the 2009-2010 academic year. (*Id.*) N.T.'s mother was later contacted by the school system "and reprimanded for holding this meeting without the school board's attorney

---

[4] "SST" is not explained by the parties.
[5] Plaintiffs allege the school system revised N.T.'s educational plan on July 27, 2009, by removing counseling services, removing social disorder as his formerly listed disability, and by making other changes without notice to N.T.'s mother and without her knowledge or participation. (Compl. ¶ 38.)

5

and nothing came of the meeting." (*Id.*) N.T. did not pass any of his classes for that academic year and received no credits for the tenth grade. (*Id.* ¶ 62.) On May 17, 2010, his mother inquired about the status of her complaint. (*Id.* ¶ 62.) (The Court assumes this allegation refers to the complaint filed on March 13, 2010.) She attended an "IEP meeting" regarding her request for updated assessments on June 11, 2010.[6] (*Id.* ¶ 64.) On June 16, 2010, she attended a resolution session with the school system regarding her complaint, but no resolution was reached. (*Id.* ¶ 65.)

> Plaintiffs indicate the following occurred in relation to the exhaustion issue:
>
> After the 2009-[2]010 school year had recessed for the summer BCBSC responded to Jane Doe's Section 504 Complaint and BCBSC would not guarantee witnesses to appear[;] therefore, the hearing was to be rescheduled once school commenced again. Jane Doe refiled her Section 504 complaint in October 2010 and on Friday, February 3, 2010 [sic] received an email regarding a conference call regarding this complaint. Jane Doe files this Complaint in order to preserve the statute of limitations on any of her claims.

(*Id.* ¶ 66.) It is unclear on which date N.T.'s mother received the email. February 3, 2010, fell on a Wednesday. If Plaintiffs are referring to 2011, then February 3 fell on a Thursday. Because the allegations are presented in chronological order otherwise, the Court presumes Plaintiffs intended to say that N.T.'s mother received the email on February 3, 2011, which was six days before the instant lawsuit was filed.

Although Defendants argue Plaintiffs failed to exhaust administrative remedies, Defendants do not contest the procedural history of this case as alleged in the complaint. In Plaintiffs' response in opposition to Defendants' motions, Plaintiffs indicate that since this case was filed, a section 504 due process hearing was conducted by a hearing officer hired by Defendants. (Pls.' Opp. Supp. Mem. 7-8, ECF No. 30.) Defendants note in their reply dated

---

[6] "IEP" refers to an individualized education program, which is a written statement for each child with a disability that is developed, reviewed, and revised in accordance with 20 U.S.C. § 1414(d). 20 U.S.C. § 1401(14).

July 18, 2011, that the school board has not made its determination based upon the hearing officer's findings and recommendations.

It is of considerable concern to the Court that the complaints made by N.T.'s mother in March 2010 and October 2010 have not yet been resolved by Defendants in August 2011. Defendants offer no explanation for the lengthy delay in this process. An entire school year has gone by without resolution, and another is about to begin. Defendants seem not to possess a sense of urgency while N.T. appears to slip farther and farther behind. Moreover, the delay violates the federal regulations that implement IDEA. According to those regulations, the hearing officer should issue a final decision on a due process complaint *within seventy-five days* of its filing. *See* 34 C.F.R. §§ 300.510(b)(1), (2) & 300.515(a)(1). Exceptions do exist to that timeline, but Defendants have not provided the Court with any facts to suggest that the exceptions apply. The dilatory manner in which these complaints have been handled is the basis for this Court's conclusion that exhaustion of administrative remedies would be futile. *See Honig v. Doe*, 484 U.S. 305, 326-27 (1988) ("It is true that judicial review is normally not available under [20 U.S.C.] § 1415(e)(2) until all administrative proceedings are completed, but as we have previously noted, parents may bypass the administrative process where exhaustion would be futile or inadequate.") Consequently, the lawsuit will proceed on its merits. If a final decision is ever rendered by the school system, then Plaintiffs are hereby granted leave to amend their pleading as necessary and appropriate to incorporate that decision.

### B. Rule 12(b)(6) – failure to state a claim

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

7

defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 1950. As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555.[7]

Defendants have specifically taken issue with Count I on the asserted ground that it fails to state a claim for relief under section 504 of the Rehabilitation Act of 1973. (Defs.' Mot. Dismiss Supp. Mem. 7, ECF No. 25.) Before addressing the merits of Defendants' argument, the Court observes that the jurisdiction of this Court was invoked under multiple statutes, including IDEA, 20 U.S.C. § 1400 *et seq.*; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Compl. ¶ 15.) To the extent that Defendants could succeed in dismissal of Count I because of failure to state a claim under section 504 of the Rehabilitation Act, it would only be a partial dismissal because Count I necessarily rests not just on section 504 but also on IDEA and ADA.[8] With that limitation in mind, the Court turns to the merits of Defendants' motion arguing that dismissal under Federal Rule of Civil Procedure 12(b)(6) of the section 504 claim is justified because it fails to state a claim for relief.

A violation of section 504 of the Rehabilitation Act occurs if an otherwise qualified individual with a disability is "solely by reason of her or his disability, . . . excluded from the participation in, . . . denied the benefits of, or . . . subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Defendants argue

---

[7] Defendants have rightly pointed out that Plaintiffs have relied upon the standard enunciated many years ago by the Supreme Court in *Conley v. Gibson*, 355 U.S. 41 (1957), to address the question of whether a complaint fails to state a claim for relief. Plaintiffs' counsel should be aware that the *Conley v. Gibson* standard was specifically abrogated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007).

[8] The Court does not condone the practice of including several causes of action in one count. Each cause of action should be separately pleaded in its own count.

Plaintiffs have failed to state a claim under this statute because they have failed to plead sufficient facts to establish that discrimination was solely based on N.T.'s disability and involved bad faith or gross misjudgment. (Defs.' Mot. Dismiss Supp. Mem. 7.)

To prove section 504 discrimination in the education context, "'something more than a mere failure to provide the "free appropriate education" required by [IDEA] must be shown.'" *Sellers v. Sch. Bd. of City of Manassas, Va.*, 141 F.3d 524, 529 (4th Cir. 1998) (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982) (alteration in original)). A plaintiff must show either bad faith or gross misjudgment, in addition to discrimination solely on the basis of disability, to succeed on a section 504 claim. *Id.* at 528-29.

In addition to the previously recounted allegations pertaining to exhaustion, the complaint includes other allegations about N.T.'s history in the Baltimore City public school system. In the first half of 2003, when N.T. was in the third grade, he was recommended for testing to determine whether he had an emotional disability that affected his involvement in the regular school curriculum and to assess his level of academic performance. (Compl. ¶ 18.) The testing included a psychological evaluation, an educational assessment, a psychiatric evaluation, and a student observation. (*Id.* ¶ 19.) After completion of the testing, the school system drafted a section 504 plan for N.T. identifying him as having a disability of "Other Health Impaired"; his educational program was adapted to provide him with accommodations and modifications in the regular education classroom; additionally, he was provided with counseling to address attentional difficulties, social skills, and self-esteem. (*Id.* ¶ 20.) These accommodations, modifications, and counseling services were regularly provided to N.T. throughout the third grade to the eighth grade. (*Id.* ¶ 21.)

When he was in seventh grade, N.T. experienced behavioral difficulties as well as difficulties in academic progress and was given a suspension at the end of the year. (*Id.* ¶ 22.)

The school system began making progress reports that indicated he was progressing academically and continued to provide N.T. with counseling services to assist him in coping with his behavioral difficulties, which involved male/female issues. (*Id.*) In the eighth grade, N.T. had difficulty coping with a particular teacher, and a verbal/physical confrontation ensued. (*Id.* ¶ 23.) His records do not indicate he was suspended because of that incident, but N.T.'s mother alleges he was suspended, ordered to attend anger management classes, and not permitted back into class until a Behavioral Intervention Plan was in place. (*Id.*) N.T. experienced academic problems in the middle of eighth grade in two subjects, language arts and social studies. (*Id.* ¶ 24.) N.T. received regular counseling sessions throughout the eighth grade. (*Id.* ¶ 25.)

In the ninth grade at City College, N.T. received no section 504 plan services such as counseling and modifications and accommodation in the regular classroom. (*Id.* ¶ 27.) N.T.'s mother attempted several times to reach the school principal by telephone, "but her calls were unanswered." (*Id.*) N.T. was suspended for five days in November 2008 (not reflected in his school records; reason not stated) and again for five days in January 2009; the latter was for an incident involving sexual harassment. (*Id.* ¶ 25.) In February 2009[9] N.T. was arrested and charged with several offenses, including assault and robbery, in connection with a fight involving fifteen to twenty students on school property. (*Id.* ¶ 28.) N.T.'s mother attended a meeting on February 10, 2009, regarding the school's recommendation to suspend him; "N.T. was allowed to present his side of the story." (*Id.* ¶ 32.) But he was not given notice of his due process rights including representation by counsel, presentation of witness testimony, cross-examination of opposing witnesses, presentation of written evidence and legal argument,

---

[9] Although the complaint's chronology appears to be generally in date order, dates are sometimes included in allegations that do not follow that order, and it is unclear whether this is due to typographical errors or whether the allegations are intentionally recounted out of order. For the purpose of deciding this motion, the Court has attempted to interpret the allegations in a logical fashion but recognizes it may not have entirely succeeded in doing so.

and sequestration of witnesses. (*Id.* ¶ 31.) The school did not hold a manifestation meeting before placing N.T. on extended suspension and, later, expulsion of him from school. (*Id.* ¶ 29.) He did not receive updated testing before a significant change in his placement occurred. (*Id.*)

In early March 2009, N.T.'s mother visited Defendant Edward Bonaparte of the Office of Suspension Services to learn what the decision was from the February 10, 2009, meeting and was told N.T. was on long-term suspension. (*Id.* ¶ 33.) N.T. attended Success Academy as an alternative placement from March until the end of the school year, but received no educational benefit from it. (*Id.* ¶ 35.) N.T.'s juvenile case stemming from the February 2009 incident was referred for community mediation, but mediation was postponed several times, and ultimately, the case was dismissed in June 2009. (*Id.* ¶ 34.)

After receiving a letter from Defendant Dr. Andrés Alonso's office saying N.T. should report to Doris M. Johnson High School and not return to City College, his mother, around July 21, 2009, began making telephone calls to City College and Alonso's office. (*Id.* ¶ 36.) Defendant Linda Cichan told her that N.T. had been expelled from City College and the school system "was 'doing her a favor' by allowing N.T. to attend Doris Johnson High School." (*Id.*) N.T.'s mother alleges she "then received a letter in the mail dated March 4, 2009 advising Jane Doe N.T. had been expelled, and advising her of her right to appeal within 10 days of the letter."[10] (*Id.*) She inquired of Alonso's office whether N.T. would receive his section 504 services at Doris Johnson High School, which he had received prior to entering ninth grade but not during his ninth grade year. (*Id.* ¶ 37.) She alleges his office "then became very friendly

---

[10] The Court infers that the letter, although dated March 4, 2009, was received by N.T.'s mother in July 2009. If so, the ten-day appeal period would have long since passed by the time she received it. This inference is logical since Plaintiffs earlier allege that, in early March 2009, she tried to find out the outcome of the meeting on February 10, 2009. (Compl. ¶ 33.) If she had received the letter in a timely fashion, her inquiry to Bonaparte would have been unnecessary. The Court notes, too, that Bonaparte advised her N.T. was on long-term suspension, not expelled.

11

and the next day advised" her that N.T. was reinstated to City College, that he would be provided section 504 services there, and City's assistant principal, Defendant Dale Halterman would set up an appointment with her regarding section 504 services for N.T. (*Id.*)

On July 27, 2009, City College revised N.T.'s section 504 plan by removing counseling services and by removing social disorder as his formerly listed disability, and it made other changes to the plan without notice to N.T.'s mother and without her knowledge and participation. (*Id.* ¶ 38.) In the tenth grade, City College did not implement N.T.'s section 504 plan, which provided for weekly teacher communications with his mother, recommended N.T. carry a daily progress monitoring sheet, and further recommended he attend "coach classes" in all core subject areas. (*Id.* ¶ 39.) On December 3, 2009, N.T. was arrested in his classroom and charged with several offenses including assault and attempted robbery; the charges related to a fight that allegedly occurred on the football field and involved several students after school. (*Id.* ¶ 40.) City College scheduled a manifestation meeting regarding the December 2009 incident but did not notify N.T.'s mother that it was a manifestation meeting until the day it occurred. (*Id.* ¶ 41.) N.T. protested he was not present when the fight happened and had several witnesses, including those actually involved in the fight, who would attest to that fact. (*Id.*) N.T. was not given notice of his due process rights of representation by counsel, presentation of witness testimony and written evidence, cross-examination of opposing witnesses, and sequestration of witnesses. (*Id.*) City College determined N.T.'s alleged behavior was not a manifestation of his disability and recommended him for long-term suspension from December 15, 2009, to January 19, 2010.[11] (*Id.* ¶¶ 41-44.) N.T.'s mother attended the meeting on December 15, 2009, and was advised of her right to appeal the decision within ten days. (*Id.* ¶ 44.) Although N.T.

---

[11] This is another instance in which the Court has made an editorial inference in order to set the allegations in logical, chronological order. The actual allegation was that the suspension would last until January 19, *2009*. (Compl. ¶ 44.)

was told at the meeting he should have brought his witnesses with him, his mother had not been told she could or should bring witnesses to the meeting. (*Id.*) Despite her request that he be provided schoolwork during the suspension, only one teacher provided N.T. with some work, and it was not enough to prepare him for his mid-term exams. (*Id.* ¶ 45.) N.T. attended an alternative placement from December 3, 2009, until January 19, 2010,[12] but he received no educational benefit from it. (*Id.* ¶ 46.) The juvenile case connected with the December 2009 incident was dismissed on February 2, 2010. The previous day, N.T. "was jumped by another student in the school cafeteria and was told he was on . . . school suspension. That same day, while on his way home, N.T. was accused of being one of several students who beat up and stole another student's backpack." (*Id.* ¶ 47.) N.T. showed up at school on February 3, 2010, but was told he was suspended and he had to leave and go home; his mother received a telephone call indicating N.T. was suspended indefinitely for fighting. (*Id.* ¶ 49.) She emailed Defendant Alonso and Defendant Timothy Dawson, principal of City College, to find out what had happened with her son. (*Id.*) Dawson told her N.T. was "recommended for expulsion for going around 'being a bully and terrorizing people' and that he had a long record listing all of this." (*Id.*) Dawson then telephoned her and asked she bring N.T. into school the next day; in this conversation, he advised her that N.T. was not suspended. (*Id.*) Dawson said he would not be there the next day, but Defendant Halterman would speak with her and N.T. would be able to give his side of the story; Dawson indicated Halterman would then determine whether N.T. would be proposed for long-term suspension. (*Id.*) As noted earlier in the section on exhaustion, this meeting was considered a manifestation meeting without notice to Plaintiffs, N.T. was not permitted to say anything, and it resulted in a recommendation for extended suspension and,

---

[12] *See* note 11.

ultimately, expulsion. (*Id.* ¶ 50.) The allegations stated earlier in the discussion on exhaustion will not be repeated here.

The detailed allegations made by Plaintiffs plausibly state a claim for relief under section 504. A jury could reasonably infer that N.T. and his mother have been whipsawed by Defendants, based upon several reversals of positions as to N.T.'s status in the school system and based upon questionable, if not nonexistent, evidence of wrongdoing by N.T. Without evidence that these important decisions were based upon reason, one could infer that N.T. has been denied educational benefits solely based on his disability. Additionally, a jury could reasonably infer that the abrupt decisions to discontinue significant parts of N.T.'s educational program, without proper assessments and evaluations, were made in bad faith or were gross misjudgments. Having met the plausibility standard for their section 504 claim, Plaintiffs may proceed with Count I intact.

## *II. Count III – negligence*

Defendants next seek dismissal of Count III, which claims negligence by Defendants resulting in damage to Plaintiffs. (Compl. ¶¶ 76-78.) Defendants, first, assert dismissal is warranted on the mistaken notion that this claim is one arising under state law and, therefore, not one over which this Court has jurisdiction. (Defs.' Mot. Supp. Mem. 7-8, ECF No. 25.) Defendants' counsel may wish to familiarize herself with the concept of pendent jurisdiction to avoid making this embarrassing argument again in the future.

Despite Defendants' misstep with regard to federal court jurisdiction, their substantive argument has merit. The essence of Count III is that, because of Defendants' acts and omissions, "N.T. has suffered substantial educational and developmental losses . . . which adversely impacts his future earnings and earning potential, and which has resulted in emotional injury, including but not limited to the loss of an appropriate public education . . . ." (Compl. ¶¶ 76-79.) This

count sounds in negligence, as its title confirms. Yet, the Maryland Court of Appeals has squarely rejected "educational malpractice" as a cause of action. *Hunter v. Bd. of Educ. of Montgomery Cnty.*, 439 A.2d 582, 583-86 (Md. 1982). Plaintiffs attempt to distinguish *Hunter* on the basis that it only involved a claim by Hunter's parents that the local school system had negligently evaluated his learning abilities in contrast to Plaintiffs' allegations in the instant case that N.T. was wrongly arrested, suspended, and removed to alternative placements. (Pls.' Opp. Supp. Mem. 10, ECF No. 30.) But the *Hunter* opinion is broadly written to embrace any claim of educational malpractice, whether it involves a complaint of negligent evaluation of a child's learning abilities or some other kind of negligence. Because the claim is not recognized as a proper one in Maryland law, Count III will be dismissed.

## III. *Count VI – civil conspiracy*

Under Maryland law, a plaintiff may succeed on a claim of civil conspiracy by proving "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Green v. Washington Suburban Sanitary Commission*, 269 A.2d 815, 824 (Md. 1970). Further, the plaintiff must prove "'the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury.'" *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 428 (Md. 2009) (quoting *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005)). "The tort of civil conspiracy 'lies in the act causing the harm; the agreement to commit the act is not actionable on its own but rather is in the nature of an aggravating factor.'" *Id. See also Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007) ("This Court has consistently held that conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." (internal quotation marks omitted)). It is not necessary for the

unlawful act or means to be criminal in nature. *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 596 A.2d 687, 699 (Md. Ct. Spec. App. 1991). "[T]he act (or means) need only be 'of such a character as to create an actionable wrong.'" *Id.*

The heart of Plaintiffs' complaint is that N.T. has been denied free appropriate public education. Thus, the heart of this case rests in the IDEA. N.T. claims damages flowing from the denial of FAPE such as an adverse impact on his future earnings potential and emotional injury. (Compl. ¶ 85.) The difficulty in this claim of civil conspiracy is the requirement that a plaintiff suffer actual damages. But Fourth Circuit precedent makes clear that no compensatory or punitive damages are available under IDEA. *Sellers*, 141 F.3d at 527. And the Maryland Court of Appeals in *Hunter*, in rejecting the tort of "educational malpractice," noted as one of the bases for its decision, "the inherent uncertainty in determining the cause and nature of any damages." 439 A.2d at 584. "[A]n award of money damages, in our view, represents a singularly inappropriate remedy for asserted errors in the educational process." *Id.* at 585.

Since tort damages are unavailable for denial of FAPE, tort damages would logically be unavailable for injuries flowing from denial of FAPE. Consequently, it would be equally illogical to premise a claim of civil conspiracy upon denial of FAPE.

To be sure, Plaintiffs' allegations have also allowed an inference that disciplinary decisions, including arrests of N.T. while at school, were based upon flimsy evidence, at best. To the extent that Plaintiffs' claim of civil conspiracy is bottomed on one or more intentional torts, then such a claim could go forward providing it satisfies the requisites of Maryland law for civil conspiracy. But the only allegations relating to an agreement among the Defendants to support a claim of conspiracy are conclusional in nature. They are the following:

> Defendants each of them, in concert, designed and implemented an unlawful agreement to retaliate against and conceal, diminish and/or alter accounts [sic] incidents.

16

(Compl. ¶ 82.)

> In so doing the acts alleged herein, Defendants and each of them formed an unlawful agreement designed to conceal the truth of the incidents complained of herein.

(Compl. ¶ 84.)

It is not enough for Plaintiffs to conclude that Defendants agreed tortiously to injure N.T. It is necessary, instead, for Plaintiffs to plead facts that allow the Court to so conclude. And a review of the rest of the complaint fails to disclose any factual allegations that would allow this specific conclusion. Consequently, Count VI fails to state a claim for relief and will be dismissed.

## *IV. Conclusion*

Plaintiffs are not required to exhaust Count I, and Defendants' motion to dismiss for failure to state a claim will be denied as to Count I, granted as to Count III, and granted as to Count VI. A separate order will be entered accordingly.

DATED this 22nd day of August, 2011.

BY THE COURT:

/s/
James K. Bredar
United States District Judge